GARMAN TURNER GORDON LLP
GERALD M. GORDON, ESQ.
NV Bar No. 229
E-mail:  ggordon@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
NV Bar No. 9040
E-mail:  tgray@gtg.legal
MARK M. WEISENMILLER, ESQ.
NV Bar No. 12128
E-mail:  mweisenmiller@gtg.legal
650 White Drive, Suite 100
Las Vegas, NV 89119
Telephone: (725) 777-3000
 Facsimile: (725) 777-3112

HELLER, DRAPER, PATRICK, HORN, & DABNEY, L.L.C.
DOUGLAS S. DRAPER, ESQ.
LA Bar No. 5073*
E-mail:  ddraper@hellerdraper.com
LESLIE A. COLLINS, ESQ.
LA Bar No. 1489
E-mail:  lcollins@hellerdraper.com
GRETA M. BROUPHY, ESQ.
LA Bar No. 26216*
E-mail:  gbrouphy@hellerdraper.com
650 Poydras St., Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Facsimile:  (504) 299-3399
*pro hac vice application pending*

*Proposed Attorneys for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| In re: <br> MSAA LV PARTNERS, LLC. <br> ☐ Affects this Debtor. <br> ☒ Affects ALL DEBTORS <br> ☐ Affects MSAA HOLDINGS, LLC <br> ☐ Affects MSAA PA PARTNERS, LLC <br> ☐ Affects MSAA PARTNERS, LLC | **BK-S-15-14589-abl** <br><br> Chapter 11 <br><br> JOINT ADMINISTRATION REQUESTED <br><br> BK-S-15-14600-abl <br><br> BK-S-15-14599-abl <br><br> BK-S-15-14598-abl |
|---|---|

**OMNIBUS DECLARATION IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS**

I, Aesha Jafrey, hereby declare as follows:

1.  I am over twenty-one (21) years of age and am competent to make this declaration (the " Declaration "). I am a member of MSAA Holdings, LLC, MSAA LV Partners, LLC, MSAA PA Partners, LLC, and MSAA Partners, LLC (hereinafter collectively referred to as "Debtors" or "MSAA").  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances surrounding the commencement of these chapter 11 cases

(the "Cases") and in support of Debtors' "First Day Motions" filed with the Court. Any capitalized term not expressly defined in this Declaration will have the meaning set forth in the relevant First Day Motion.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with management and the other members, and other of the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Debtors.

**A.    Company Overview**

3. Debtors were formed in 2006 in order to acquire from Long John Silver's ("LJS") certain store and development rights in the Las Vegas, West Virginia and Pittsburgh markets ("Market Area").  In 2006, Debtors acquired from LJS approximately 51 LJS locations.

4. The majority of Debtors' stores are leased locations with third party landlords.

5. The "quick service "food industry is a "mature Market" that is advertising reflexive.  The fact the industry is a mature industry means that the total dollars in the United States spent on fast food on a year by year basis does not change.  The variable on a yearly basis is the type of food and franchise that is able to attract the consumer.  An example of the ebbs and flows in the market is the recent downturn in the McDonalds sales that are now being captured by new hamburger chains and healthier dining options.  LJS sells basically fried fish which goes against the grain of the current health food craze.

6. The demographic of the Long John's Silver customer is an older demographic. This demographic is far more heath conscious than the 18-24 year old Taco Bell and Subway customer.  From a marketing perspective it is a challenge to sell the American public that fried

fish is a healthy food alternative.  The older demographic customer is on a fixed budget and the customers dining option is geared to eat-in service restaurants such as Outback and Olive Garden.

7. The Debtor does not have sufficient capital to weather the significant sales downturn and hope that the tastes of the American consumer changes or that a way is developed to sell healthy fried fish

8. Debtors are in the process of negotiating an Asset Purchase Agreement ("APA") with Long John Silver's, LLC ("Long John") wherein Long John will purchase certain assets of Debtors' estates and assume certain executory contracts.

9. The Debtors, prior to filing, have closed a number of their restaurants and are negotiating an Asset Purchase Agreement ("APA") with LJS.  Under the terms of the APA, LJS will acquire twenty-three (23) operating restaurants as a going concern.

**B.     Summary of First Day Pleadings**

10. I have read and reviewed the following First Day Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief.

    a.  **Motions For Order Under Fed. R. Bankr. P. 1015(b) Directing  Joint Administration Of Chapter 11 Cases**;

11. The four related and affiliated Debtors were formed in 2006.

12. Debtors are each operated and managed by MSSA Holdings, LLC ("Holdings").  Holdings provides management and corporate services to each Debtor.  I am the main principal of Holdings.

13. Debtors MSAA LV Partners, LLC, MSAA PA Partners, LLC and MSAA Partners, LLC operate 49 Long John Silvers, Kentucky Fried Chicken and A&W Root Beer franchise stores located in Nevada, Pennsylvania and West Virginia.

14. General Electric Capital Corporation (GECC) has a lien on all of the assets of Debtors. The loan documents provide for cross collateralization and cross defaults.

15. In order to optimally and economically administer these pending chapter 11 cases, these chapter 11 cases should be jointly administered, for procedural purposes.

    b. **Motion of the Debtor Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs;**

16. Due to the complexity and diversity of the Debtors' operations and their limited manpower and the need to operate the stores, prepare reports to the franchisor, address logistic issues with respect to the delivery of goods to Debtors and prepare for the sale of the restaurants, Debtors anticipate that they will be unable to complete their Schedules and Statements in the time required under Bankruptcy Rule 1007(c). To prepare their required Schedules and Statements, Debtors must compile information from books, records, and documents relating to a multitude of transactions. Collection of the necessary information will require a significant expenditure of time and effort on the part of Debtors and their employees.

    c. **Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes;**

18. Debtors seek to pay its Employees for work performed prepetition, to honor other prepetition Employee-related obligations and benefits, and to continue paying their Employee obligations in the ordinary course of Debtors' business. In addition, Debtors seek authorization for their banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' payroll and/or general disbursement accounts, to the extent that such checks or transfers relate to any of the prepetition Employee obligations.

4

19. Immediately prior to the filing, the Debtors employed 1216 full and part-time Employees to manage, oversee and operate its business and restaurants on a day-to-day basis. Approximately 1166 Employees are hourly and 50 Employees are on salary. Debtor compensates its Employees on a bi-weekly basis in arrears.

20. The continued operation of Debtors' business and their successful reorganization depends largely upon the retention of the services of the Employees and the maintenance of Employee morale and cooperation. Consequently, it is critical that Debtors be authorized to satisfy their Employee-related obligations and continue its ordinary course Employee plans, policies, and programs in effect as of the Petition Date. Moreover, if the checks issued and fund transfers requested in payment of the prepetition Employee obligations are not honored, or if such earned obligations are not timely paid post-petition, the Employees could suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. In addition, it would be inequitable to require Employees to bear personally the cost of any business expenses they incurred prepetition for Debtors' benefit with the understanding that they would be reimbursed.

21. Debtors, in the ordinary course of business, also accrue state, local and federal employment and withholding taxes relating to wages earned by the Employees, which taxes are calculated based upon statutorily mandated percentages of earned wages.

22. I believe that the authority to pay all Employee obligations, including Employment and Withholding Taxes, in accordance with Debtors' prepetition business practices is in the best interests of Debtors and their estates and will enable Debtors to continue to operate their businesses in chapter 11 without disruption and to prevent immediate and irreparable harm to Debtors. A substantial reduction in force, which would likely occur if Employees were not

paid, would cause immediate and irreparable harm to the estate and severely hamper Debtors' reorganization efforts.

23. The only insiders who receive compensation from the Debtors are (a) Aesha Jafrey, who receives $4,800 bi-weekly, (b) Syed Jafrey, who receives $1,700 bi-weekly, and (c) Zafar Jafrey who receives $1,000 bi-weekly, are paid by MSAA Holdings and, as such, shared amongst the Debtors The individuals perform actual services for Debtors and form the management team that oversees the operation of the Debtors' businesses. No payments will be made in excess of the statutorily permitted amounts. The combined compensation paid to these three insiders is $15,000.00 per month.

    d. **Motion for Interim and Final Orders: (A) Prohibiting Utilities from Altering, Refusing or Disconnecting Services to, or Discriminating Against, The Debtor on Account of PrePetition Amounts Due, and (B) Establishing Procedures for Determining Requests for Adequate Assurance;**

24. In the ordinary course of their business, Debtors may incur utility expenses for water, electricity, natural gas, telephone service, internet service, and other services. Multiple utility providers (collectively, the "Utility Providers") provide these services to Debtors. I believe that uninterrupted utility services are essential to Debtors' ongoing operations and to the success of the Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, Debtors' business operations could be disrupted, and such disruption would jeopardize Debtors' reorganization efforts and impair the quality of the food located in the Debtors' on site storage facilities. Thus, I believe it is essential that the utility services continue uninterrupted during the Cases.

25. Debtors expect to have sufficient liquidity to timely pay all post-petition obligations owed to its Utility Providers. To provide additional assurance of payment for future services to the Utility Providers, I understand that Debtors propose to provide a deposit to each

requesting Utility Provider in an amount equal to thirty (30) days' worth of the utility service (after the utility applies any deposit to its pre-petition bill) as calculated by Debtors according to the last historical 52-week period ("Adequate Assurance Deposit" and together with the cash flow from operations, collectively, the "Proposed Adequate Assurance"); provided, however, that Utility Providers may object to the Proposed Adequate Assurance if (a) such a request is made in writing no later than thirty (30) days after the date upon which the Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payment is filed (the "Request Deadline"); (b) such requesting Utility Provider does not already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit); and (c) such requesting Utility Provider is not currently paid in advance for its services. I believe that the Proposed Adequate Assurance provides the protection required to grant sufficient adequate assurance to the Utility Providers.

    e.    **Motion for Order Under 11 U.S.C. §§ 105(a) and 503(b)(9) Establishing Procedure for Treatment of § 503(b)(9) Claims;**

26. Debtors have several vendors that have sold goods to Debtors within twenty (20) days of the Petition Date. These vendors sell Debtors goods that are essential to Debtors, and without those goods, Debtors' business will be disrupted. Debtors believe that a uniform procedure allowing these vendors to exercise their rights under section 503(b)(9) of the Bankruptcy Code will be fair to all parties.

27. Moreover, because of the size of Debtors' business generally, and, in particular, the constant and quick, one (1) or two (2) day turnover of inventory, the fact that Debtors' inventory primarily consists of perishable goods, and the volume of inventory receipts and sales due to the number of locations, it is not feasible for Debtors to return inventory shipments to vendors in response to any reclamation notices. Furthermore, absent the establishment of an

orderly process, Debtors' business operations might suffer and management's attention would be diverted from important operational issues in order to deal with the reclamation claims.

    f.    **Emergency Motion of Debtors for Entry of and Order Authorizing Debtors to Honor Certain PrePetition Obligations to Customers and to Otherwise Continue Customer Programs in the Ordinary Course of Business**;

28.    Debtors' businesses are highly competitive and their customers are price conscious. In order to drive sales to Debtors' locations and away from competitive brands, Long John Silver's, A & W Root Beer, Kentucky Fried Chicken and Debtors issue discount coupons and sell gift cards. In order to maintain sales at Debtors' operating locations and not injure the Franchisors brand, it is imperative that Debtors honor coupons and discounts that were issued pre-petition. The cost of honoring the coupons and gift cards on a monthly basis is nominal, however, the effect on sales would be significant if Debtors were unable to honor the coupons issued prepetition by it and Long John Silver ("LJS") and the other franchises (the "Coupon Program").

29.    Debtors submit that continuing and honoring the Coupon Program is essential for maintaining Debtors' customers' goodwill and continuing Debtors' businesses. The negative impact of refusing to honor the Coupon Program would harm Debtors' relationships with their customers and jeopardize Debtors' the value of the Debtors assets.

    g.    **Motion of Debtor for Authority to Pay Prepetition PACA Claims;**

30.    Debtors believe that certain of their suppliers and/or vendors will file notices under PACA to preserve any rights they may have thereunder. Prior to the Petition Date, certain of the Debtors' vendors sold goods to the Debtors that may be deemed "perishable agricultural commodities," as such term is defined under PACA and other eligible goods covered by state statutes of similar effect. The produce covered by PACA includes fruit , vegetables and French fries

31. Prompt payment of certain PACA Claims is essential to maintaining Debtors' restaurant operations, and maximizing the value of Debtors' assets and estates and the success of the Cases. Should any PACA Claimant refuse or discontinue sale of produce to any restaurant, even for a brief period of time, Debtors may be forced to cease their restaurant operations, resulting in a substantial disruption of their restaurants and loss of substantial revenue. Additionally, absent the relief requested herein, Debtors could be subjected to countless actions from PACA Claimants seeking enforcement of their PACA Claims, which would result in the unnecessary expenditure and misallocation of Debtors' limited financial and human resources. If forced to take court action, the PACA Claimants will also seek attorneys' fees and interest, to the further detriment of these estates and their creditors.

32. The relief requested herein is also appropriate because assets in the Trust do not constitute property of the Debtors' estates. Holders of valid PACA Claims would be entitled to payment from the applicable statutory trust ahead of the Debtors' other creditors. Thus, the requested relief does not prejudice the Debtors' creditors. In fact, payments to holders of allowed PACA Claims are consistent with the intent of PACA and will inure to the benefit of the Debtors and all parties in interest.

33. Finally, it is the Debtors' business judgment that the prompt satisfaction of valid PACA Claims will promote their ability to maximize creditor recoveries and is in the best interest of the Debtors' estates.

    h.    **Motion For Entry Of An Order Under 11 U.S.C. §§105, 363, 364, 1107 and 1108 Authorizing Maintenance Of Existing Bank Accounts, Continued Use Of Existing Business Form, Continued Use Of Existing Cash Management System Up to November 1, 2015 And For Related Relief;**

34. Prior to the Order for Relief Date, Debtors, in the ordinary course of their businesses, maintained several bank accounts as detailed in the Motion. These bank accounts include a depository account for each store location and a main operating account in the name of each individual Debtor.

35. The cash management system (the "Cash Management System"), is as follows: The Debtors' store managers deposit the daily cash received by each store into a Deposit Account. All of the Deposit Accounts are zero balance accounts and transfer all of their net deposits into each store's corresponding Operating Account. Funds are moved between Debtors on an as needed basis. General Electric has a security interest in all of the Debtors' assets, and the proceeds therefrom, which secures the total indebtedness to General Electric. All disbursements, including the funding of payrolls through a third party payroll company, are made from the Operating Account for each of the Debtors.

36. To minimize expenses to the estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks and bookkeeping records existing immediately before the Petition Date until November 1, 2015. The use of the forms is essential and required under the franchise agreements executed between the Debtors and their franchisors.

37. Changing correspondence and business forms would be unnecessarily burdensome to the estates, as well as expensive and disruptive to Debtors' operations. These additional costs would reduce the resources available in the estates to satisfy the claims of creditors and other parties in interest. Similarly, opening a new set of books and records as of the Petition Date would create unnecessary administrative burdens and expense. For these reasons, Debtors request authority to continue to use their existing records as well as their checks and business forms and to not close the existing books and open new books and records for Debtors as of the Petition Date. The existing books and records of Debtors are sufficient to allow the Court and parties in interest to differentiate between financial transactions which occurred prior to and subsequent to the Petition Date.

    i. **Emergency Motion For Entry Of Interim and Final Orders Pursuant To Sections 361, 362 And 363 Of The Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001: (1) Authorizing Use Of Cash Collateral; (2) Granting Adequate Protection; (3) Scheduling And Approving The Form And Method Of Notice For A Final Order; And (4) For Related Relief**;

38. GECC as the prepetition lender to the Debtors, has a security interest in the assets of the Debtors which includes cash and cash equivalents generated from their business operations. As such, GECC claims that all such cash and cash equivalents are Cash Collateral. Debtors need immediate authorization to use Cash Collateral in order to continue operating their businesses. Having immediate access to that Cash Collateral enables Debtors to operate their businesses and the preservation of these operations is essential for Debtors' reorganization.

39. Absent immediate authority to use Cash Collateral to fund its day-to-day operation, I believe that Debtors would be compelled to shut down its remaining operations and bring the businesses to a halt. In sum, the failure to obtain authorization for the use of Cash Collateral would be extremely detrimental to Debtors and disastrous to its creditors, and result in immediate and irreparable harm. Debtors' cash collateral budget for the initial two week period will be used to fund payroll, supplies and food materials, post-petition sales taxes and utility deposits to the extent deposits will be required.

40. I believe the proposed Budget provides for payment of those expenses which, if not paid, would result in immediate and irreparable harm to the estate. The budgeted amounts (contained in the Budget) are reasonable and necessary, in my opinion.

41. Debtors have proposed various forms of adequate protection to help protect GECC against any decrease in the value of its interests in its prepetition collateral for the duration of the requested use of Cash Collateral, thus paving the way for the consensual use of Cash Collateral and a more seamless transition for Debtors into bankruptcy.

42. Under the circumstances, I believe that the terms and conditions contained in the Motion and Interim Order are fair and reasonable and in the best interests of the Debtors' estates and creditors.

j. **Motion For Order Under 11 U.S.C. §§ 105(A) And 365(A) And Fed. R. Bankr. P. 6006 Authorizing Debtor To Enter Into Transition Services Agreement.**

43. In order to effect a seamless transfer of the stores to LJS if it is the successful purchaser, it is essential that the Debtors and LJS work together to: (i) identify key employees who will become LJS employees; (ii) transition the receipt of other goods and services used incident to the operation of the restaurants to LJS; and (iii) institute systems for the post sale operation of the stores.

44. The Agreement is at no cost to the Debtors and is terminable if another buyer for the Debtors' assets is located. It is unlikely that any other buyer will purchase the Debtors' assets to operate as LJS inasmuch as LJS' consent is required for the Debtors to assume and assign the Franchise Agreements.

45. The Agreement is cancellable and will not have any adverse effect on the ability of the Debtors to market their assets to third parties.

46. Execution of the Transition Services Agreement is a material condition precedent to the proposed APA. Under the Transition Services Agreement, Long John will provide certain management consulting and oversight services to Debtors.

## CONCLUSION

I believe that the relief sought in each of the First Day Motions (a) is in the best interests of the estate and its creditors; (b) is vital to enable Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses, or loss of productivity or value; and (c) constitutes a critical element in achieving the Debtors' successful reorganization and confirmation of a plan of reorganization.

. . .

. . .

. . .

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 13th day of July, 2011.

_____
Aesha Jafrey